Filed 4/17/13  W2007 La Costa Resort v. Sephora USA CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| W2007 LA COSTA RESORT CO., LLC,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SEPHORA USA, INC.,<br><br>Defendant and Respondent. | D060414, D061018<br><br><br>(Super. Ct. No.<br> 37-2009-00060693-CU-BC-NC) |

APPEALS from a judgment and order of the Superior Court of San Diego County, Earl H. Maas, III, Judge.  Affirmed.

Defendant Sephora USA, Inc. (Sephora) entered into a contract with plaintiff W2007 La Costa Resort Co., LLC (La Costa) that provided Sephora would hold its 2009 store director conference (SDC) at La Costa's hotel, the La Costa Resort & Spa (the hotel).  The contract also provided that, subject to Sephora's right to cancel under a contractual clause (the performance clause), which is the focus of this action, Sephora would also hold its 2010 SDC at the hotel.  However, after the 2009 SDC, Sephora canceled the contract for the 2010 SDC at the hotel, citing its right to do so under the

performance clause, and La Costa filed this action alleging Sephora breached its contract with La Costa.

The trial court, after hearing conflicting evidence of the etiology of the performance clause, ruled the intent of the clause was to give Sephora the right to cancel the 2010 SDC if it, in the exercise of its sole judgment, was not satisfied with La Costa's performance in connection with the 2009 SDC and believed the deficient performance materially impacted the SDC. However, the court recognized there was evidence from which a trier of fact could conclude Sephora canceled the contract for the 2010 SDC for reasons unrelated to Sephora's judgment as to La Costa's performance in connection with the 2009 SDC. Because the implied covenant of good faith and fair dealing required that Sephora base its decision to cancel on its dissatisfaction with La Costa's performance at the 2009 SDC, and barred Sephora from using the performance clause as a pretext for canceling the 2010 SDC for reasons unrelated to its judgment as to La Costa's performance at the 2009 SDC, the court adopted a special verdict form that tendered to the jury whether Sephora's cancellation breached the contract with La Costa. The jury found in Sephora's favor, and La Costa appeals.

La Costa contends we must reverse the judgment because the special verdict form deprived the jury of the opportunity to adjudicate La Costa's claim alleging Sephora breached the implied covenant of good faith and fair dealing when it canceled the 2010 contract. La Costa also appears to contend the trial court's foundational determination-- that the intent of the clause was to give Sephora the right to cancel if in the exercise of its sole judgment it was not satisfied with La Costa's performance in connection with the

2

2009 SDC and believed the deficient performance materially impacted the SDC--is without substantial evidentiary support.

II

FACTUAL BACKGROUND

A. The Contract Negotiations

Sephora, a national retailer of cosmetics and fragrances, annually holds a multi-day event (the SDC) at a resort location to bring together corporate management, store managers, brand representatives and others. The SDC, which averages around 600 attendees and costs approximately $1 million, is designed to allow Sephora to share strategic information with its field organization and to train and motivate its employees.

Sephora held the SDC at a resort in Scottsdale, Arizona, for many consecutive years, but outgrew that facility and was searching for a new location starting with the 2009 SDC. Sephora consulted with a hospitality company (TPG) to find this new location and to assist in negotiating contract terms, and TPG presented the hotel for Sephora's consideration.

At the relevant time, the persons at Sephora with primary responsibility for site selection, contract negotiation and the operational aspects of the SDC were Elizabeth Green and Mary Herald. Green, who reported to Herald, was Sephora's manager for corporate events, with day-to-day responsibility for planning and executing the SDC. Herald, an executive vice president of retail operations for Sephora, had overall responsibility for the SDC for the previous 11 years. The persons representing La Costa

3

in the sales and contract negotiations were Megan Warzeniak (La Costa's regional sales director for group sales) and Marti Coons, a group sales manager on site at the hotel.

La Costa pushed for a multi-year agreement. However, Sephora wanted a one-year contract, as they always had when contracting for prior SDC's (even though Sephora ultimately returned for many consecutive years to the same resort), in part because this was the first time Sephora had been to the hotel and did not want to overcommit to a facility with which it might not be happy. Green specifically told La Costa representatives about Sephora having a disappointing experience at an event held at a Utah resort, at which Sephora had also declined the resort's request for a multi-year arrangement, and explained Sephora was glad it had not been required to return to the Utah site. Green told La Costa that Sephora did not want to be locked into a two-year commitment.

In February 2008 La Costa sent a draft of a contract to Sephora's agent, TPG, using the standard form contract it uses for group meeting events. The standard form does not contain a performance clause, and the draft contract sent to TPG (and thereafter to Sephora when it assumed the negotiations from TPG and removed TPG as Sephora's negotiating agent) did not contain any performance clause.

Warzeniak met with Green on March 5, 2009, to review the draft contract. Green, reiterating the need for a performance clause,[1] told Warzeniak about Sephora's unhappy

_____

[1]     TPG had previously told Warzeniak that a performance clause would be necessary because Sephora was nervous about committing for two years, but such clauses are rare and La Costa had decided internally that it would not include that clause in the original draft. Indeed, when Warzeniak's boss (Coons) first saw that an iteration of a

experience with the Utah resort.  Green also told Warzeniak that Herald did not want to be locked into a multi-year contract, and any multi-year agreement would have to include a performance-based cancellation clause to alleviate Herald's fear of being locked into a two-year commitment.

La Costa responded with a first draft of a proposed performance clause.[2]  Sephora was dissatisfied with the language because it did not adequately reflect the protections it sought and was inconsistent with what Warzeniak promised to include, because Green had been assured Warzeniak had no problem including a performance clause permitting Sephora to cancel if it was unhappy with the 2009 SDC.  Green had told Warzeniak that *Sephora* needed the right to evaluate whether it was happy with the hotel's performance, *not* the hotel or anyone else, and she told Warzeniak the clause was unacceptable.  Green's e-mail to Warzeniak, after stating Herald was "dead set against" a two-year commitment, explained it was "[n]ot that she doesn't want to stay somewhere for 2 or more years, she just doesn't want to be stuck to 2 years if she isn't 100% satisfied.  So we either really need to change the wording of the contract or look at what it's going to cost doing it 1 year at a time. . . ."  Warzeniak, who knew Herald and Green were scheduled to arrive at the hotel the next day for a site visit to inspect the hotel, raised no objection to a

_____

performance-based cancellation clause was to be included in the contract, Coons asked Warzeniak whether Sephora had asked for a performance clause (because La Costa had decided not to offer it) and expressed concern that it would expose La Costa to a major cancellation were the clause exercised.  However, Warzeniak stated the clause was "always on the table."

[2]     The clause stated Sephora could cancel if the hotel "fails to materially adhere to the performance standards in place at the time this contract is signed and/or loses more than fifty percent of the designations awarded by the meetings press . . . ."

5

clause accommodating Herald's demand for protection. Warzeniak understood Herald "owned the program" and Herald "didn't put down 80 percent or 90 percent. When people are wanting to be 100 percent satisfied, they say 100 percent satisfied."

After the site visit by Green and Herald was successful, La Costa redrafted the performance clause.[3] Because the redrafted clause represented a change to its standard contract, it was necessary for La Costa's director of sales (Mr. Allen) to approve the language. La Costa revised the performance clause to provide:

> "[Sephora] reserves the right to cancel this contract without penalty based upon the performance of the hotel for the 2009 Program. Should [Sephora] in its sole opinion determine that the Hotel's performance was not satisfactory and[,] as a result, materially impacted the success of the program, [Sephora] may cancel this contract within 30 days of the operation of the 2009 Program . . . ."

When Coons presented this language to Mr. Allen, she explained La Costa "need[s] to add a looser performance clause to [Sephora] in order for them to sign a 2 year contract." At the time this clause was drafted, Sephora had not indicated it would accept anything other than Herald's "100 percent satisfaction" standard. After Mr. Allen approved the language, Coons expressed pleasure and stated that "[w]e now have one week to get this signed--let's go for it![4]"

---

[3] TPG, apparently unbeknownst to Sephora, suggested La Costa use the following language to satisfy Sephora: "Should [Sephora] in its sole opinion determine that the Hotel's performance was not satisfactory" it could cancel the second year without liability. Although TPG had already been supplanted by Sephora in negotiating the contract, TPG's potential commission gave it a financial incentive to assist La Costa in bringing the contract to culmination.

[4] Sephora presented evidence that La Costa sales staff had personal financial incentives to secure Sephora's agreement to the contract before the end of the first quarter

6

On March 18, 2008, Coons e-mailed the language of the revised performance clause quoted above, stating "here is the revised performance clause that is much more flexible. Please let me know what you think." This was the first communication Sephora received after Green had told Warzeniak that any multi-year contract needed to be conditioned on Herald's 100 percent satisfaction with the hotel's performance, and Green understood the language was meant to meet Herald's requirement, i.e. Sephora could cancel the contract for the 2010 SDC if, in Sephora's sole opinion, the hotel's performance was not satisfactory and, in Sephora's sole opinion, that performance negatively impacted the success of the program. As Green explained at trial, La Costa assured her "they would do--anything to make us comfortable."

On March 20, 2008, Warzeniak (apparently responding to an inquiry from either Coons or Allen asking, "How are we doing on Sephora for month end?") reported she had met with Green that morning to finalize the contract and Green thought the performance clause "looked great." Green testified she still understood the performance clause gave Sephora the discretion to determine whether the hotel's performance was satisfactory and whether it materially impacted the program, and she expressed appreciation to Warzeniak about inclusion of the clause. Warzeniak assured Green that La Costa was not concerned about the performance clause because La Costa was not worried about any performance issues, and Warzeniak was eager to get the contract signed by the end of March. Green testified Warzeniak never suggested the language contained any limitations on Sephora's

of 2009, because this was a new booking and involved a multi-year agreement. There was some evidence the hotel staff was also motivated to secure this conference because it represented a significant block of booked rooms during a less busy time of year.

7

discretion, and instead had reassured Green that Sephora was protected but that Warzeniak wasn't worried Sephora would ever have to exercise it.[5]  On March 31, 2008, Sephora signed the contract to hold the SDC for 2009 and 2010 at the hotel.[6]

B. The Attempts to Scale Back the 2009 SDC

After the contract was signed, the recession of 2008 began, and Sephora was looking at all avenues to reduce costs to "ride out [the] recession with hopefully all of our people intact," including renegotiating to reduce the costs of the 2009 SDC.  Herald told Green to cut the SDC budget and that it was in danger of being canceled if Sephora was unable to reduce the costs.  Green began cost discussions with La Costa and, as a first step, exercised its allowable "attrition" under the contract, telling Coons the budget for the 2009 SDC had been cut by $400,000.  Green also advanced proposals that would release certain contract benefits and meeting spaces in exchange for La Costa's help in reducing the overall budget.

La Costa countered with various proposals offering concessions, but was also "pressing hard to remove" the performance clause, which was unacceptable to Sephora.

---

[5]     In support of La Costa's claim that the "material impact" language was understood by both parties as imposing an objective limitation on Sephora's right to cancel, Warzeniak testified she and Green had discussions about the clause in which both agreed the hotel would have to "f-up the meeting in order for that to be in play, the clause in play."  However, during La Costa's cross-examination of her, Green *denied* any such discussions occurred with either Warzeniak or Coons, and testified she understood Sephora could cancel if it was not "completely satisfied" with the hotel's handling of the 2009 SDC.

[6]     That day, the hotel expressed jubilation at the contract, and TPG was happy about the substantial commissions it earned.  Coons and others earned bonuses once Sephora was induced to commit to the contract.

8

Herald's review of La Costa's proposals led her to conclude Sephora would not be realizing any significant cost savings for the 2009 SDC, and Green characterized the proposals as not being "really genuine offers." Herald informed La Costa there had been "no real effort to work with us on bringing down the cost of this meeting," and she was "hopeful that you can put together a more sincere proposal." However, the negotiations ultimately bore no fruit, and Sephora decided to go forward with the 2009 SDC under the existing contract. On April 9, 2009, Herald informed La Costa Sephora would go forward with the 2009 SDC under the existing contract and "[u]pon completion of the 2009 program we will evaluate our rights under the contract with regard to the 2010 program." Herald informed Mr. Suliteanu (Sephora CEO and President) of her inability to successfully negotiate any cognizable concessions from La Costa, characterizing La Costa's negotiators as "not reasonable people (quite disrespectful actually)," and he replied that he was sure Herald had done "everything you could. Guess these guys won't be seeing our smiling faces in '10." Suliteanu testified this was not a directive to cancel the contract for the 2010 SDC.[7] He explained he played no role in the site selection process, did not know whether there was a single contract covering multiple years or separate contracts, did not participate in drafting the contract in this case, had not seen the contract with La Costa during this time frame, and only learned there was a contract with La Costa for the 2010 SDC when the present lawsuit was filed.

---

[7]     Herald testified she did not understand Suliteanu's comment in his e-mail to be a directive to cancel the 2010 contract. Instead, after the renegotiations failed, Sephora had made no determination whether to return to the hotel in 2010.

C. <u>The 2009 SDC and Its Aftermath</u>

Sephora presented evidence that the hotel's performance during the 2009 conference was not satisfactory.[8] The check-in procedures were unduly long, with some guests waiting up to 45 minutes in line before checking in, resulting in complaints from guests. Although La Costa's group reservations coordinator apologized for the problem, Green testified the first day sets the tone for the conference, and also explained how the check-in problems had a significant negative impact on the program. The hotel also apparently disregarded Sephora's instructions that guests checking in without credit cards should be allowed to do so, with any incidentals billed through Sephora's master account; instead, the hotel did not permit the guests to check in without a credit card, which embarrassed these attendees and delayed their ability to check in. As a result of these (and other) first-day snafus, some attendees were late for or entirely missed an important educational session schedule on the first day, and others missed the complimentary lunch and therefore attended the session while hungry and tired after a long day of travel.

The hotel also mishandled the arrival of a keynote speaker (and prospective partner of Sephora), who was so displeased with the room and the hotel's response to her complaints that she packed up and was about to leave the hotel (as well as threatening to cancel the speech and to terminate the partnership negotiations) when Green first learned of the problem. Green explained that, although she was able to salvage the situation, Sephora was still dealing with the repercussions of that snafu nearly two years later.

---

[8] Indeed, Green testified that, in the months leading up to the 2009 conference, she encountered numerous difficulties while interfacing with the hotel over event planning issues.

Sephora also produced evidence of other problems encountered during the conference, including problems with the food and beverage service, the audio-visual equipment, and privacy concerns.

Following the 2009 SDC, Herald and Green met and extensively discussed their concerns regarding the hotel's performance and decided Sephora "did not want to go with a second year with [La Costa]." Thereafter, on September 18, 2009, Herald sent notice to La Costa that Sephora was exercising the performance clause because "Sephora has determined in its sole opinion that La Costa's performance was not satisfactory and, as a result, materially impacted the success of the 2009 program." Green then began for the first time to explore and pursue other options for the 2010 SDC.

II

PROCEDURAL BACKGROUND

A. The Complaint

In October 2009, La Costa filed its complaint, alleging claims for breach of contract and breach of the covenant of good faith and fair dealing. The separate claims apparently rested on different underpinnings. The claim outlined in La Costa's first cause of action, denominated as a claim for "breach of express contract," was rooted in the express terms of the performance clause: it alleged that the performance clause only became operable if the hotel's performance "**materially impacted** the success of the program," and that because the hotel's alleged unsatisfactory performance "did not *objectively* 'materially [impact] the success of the 2009 Program[,]' [¶] . . . Sephora's

11

invocation of the [performance clause] to terminate the August 2009 Contract constitutes a breach of contract."  (Italics added.)

The claim outlined in La Costa's second cause of action, denominated as a claim for "breach of the covenant of good faith and fair dealing," alleged an alternative theory of recovery.  This claim was apparently rooted in the theory that, even assuming the performance clause gave Sephora sole discretion to assess *both* whether the hotel's performance was unsatisfactory *and* whether such unsatisfactory performance materially impacted the success of the program, Sephora "subjectively lacked the good faith belief that the Resort's performance was 'not satisfactory and[,] as a result, materially impacted the success of the program,' " and therefore the cancellation amounted to a "failure to act fairly and in good faith," thereby breaching the implied covenant of good faith and fair dealing.  As more specifically developed at trial, La Costa's theory was that even if both the satisfactory performance and material impact determinations were within Sephora's sole discretion, the implied covenant mandated that those decisions be made honestly and in good faith.  La Costa asserted that, if the jury concluded Sephora had already decided to cancel before the 2009 SDC was held, Sephora's stated reasons for canceling were a pretext and in breach of the implied covenant because Sephora canceled for reasons unrelated to its opinion on whether the hotel's performance was satisfactory or whether such unsatisfactory performance materially impacted the program.[9]

---

9       Sephora moved for nonsuit as to La Costa's claim for breach of the implied covenant of good faith and fair dealing, arguing the contract specifically provided Sephora a discretionary right to cancel the 2010 SDC, and the implied covenant cannot be applied to prohibit a party from doing what is expressly permitted under the contract.

12

B.  The Evolution of the Jury Instructions and Verdict Form

Because La Costa's appellate claims rest largely on the instructions and verdict form given to the jury, we detail the evolution of those issues.  Prior to trial, the parties submitted their revised list of jury instructions.  La Costa did not request CACI No. 325, the approved jury instruction on the implied covenant of good faith and fair dealing, but instead submitted proposed special pinpoint instructions purporting to encapsulate the implied covenant of good faith and fair dealing claim.  Concurrently, Sephora moved for judgment on the pleadings on La Costa's claim for breach of the implied covenant of good faith and fair dealing, arguing that under *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342 (*Carma*), La Costa's implied covenant claim failed as a matter of law because the contract specifically provided Sephora a discretionary right to cancel, and La Costa's implied covenant claim sought improperly to hold Sephora liable under an implied covenant for doing what Sephora was expressly permitted to do under the contract.  The court exercised its

The trial court, after construing the performance clause as intending to provide Sephora with sole discretion to determine both the satisfactory performance and material impact elements, rejected Sephora's argument that La Costa's implied covenant claim sought to contradict these express terms of the contract, explaining in its written ruling that "[t]he testimony is undisputed . . . that some actual material impact to the conference had to occur and that pre-conference financial disputes would not qualify to invoke the termination right.  The jury will determine, based upon the admitted evidence, whether the decision was made to terminate the contract before the 2009 conference, or whether [Sephora's] invocation of the performance clause was legitimately exercised."  La Costa's counsel, referring to the ruling on the breach of the implied covenant of good faith and fair dealing claim, stated, "What you've written here is exactly right.  It states the law correctly.  It's the essence of our case.  If there's a pretext, we prevail.  You said it correctly here, Judge."

13

discretion and elected not to rule on Sephora's motion, stating it would hear it on request as a directed verdict motion if the facts developed at trial warranted such a motion.

During trial, the parties again conferred with the court regarding jury instructions, and Sephora, resurrecting its argument under *Carma*, filed a motion for nonsuit. On June 1, 2011, the court heard arguments concerning the jury instructions. La Costa's counsel argued the instructions were incomplete because there was no instruction informing the jury that a breach of the implied covenant would constitute a breach of contract.[10] The court, after hearing argument, determined it would give CACI No. 325 to cover La Costa's claim for breach of the implied covenant. La Costa's counsel expressed concern that CACI No. 325 did not expressly state that, if the jury found Sephora violated the implied covenant, that also comprises a breach of contract, and asked that "one sentence . . . be shoved into one of these instructions" explaining that concept. The court assured La Costa that, once it determined the legal issues before the court, "we're going to have to craft a special instruction based on whatever the Court rules that tells the jury what they are supposed to do," and La Costa reiterated its concern that "we need the jury to understand that [if] Sephora decided they were canceling . . . '10 before '09 began[,] [t]hat's a violation of the duty of good faith and fair dealing. It's a separate matter. So I am asking for that one sentence some place."

---

10    As La Costa argued, "[t]here's not an instruction . . . that tells them that a violation of the duty of good faith and fair dealing is a breach of contract. . . . If they can conclude it was a pretext and that this meeting was canceled before it began--2010 was canceled before 2009 began--there's nothing in here that [lets] them find for us. That is a separate count. That's the heart of our evidence. The heart of our suit. It's the heart of what we've alleged. . . ."

14

After the court instructed counsel to draft proposed instructional language based on CACI No. 325, the court turned to the special verdict form, indicating it was inclined to give Sephora's version that more closely tracked CACI No. VF-300, which is designed for breach of contract cases. La Costa objected, stating its position as to the special "tracks [our] previous objection in regard to the instructions. We believe that the special verdict form lacks in its questions anything relative to pretext. . . . [I]f the jury [concludes the] 2010 meeting was going to be canceled before the 2009 meeting ever began, there's nothing here . . . that directs [the jurors] if they so find that that's a breach [of contract] and that they should then go to the damage question. . . ."

On June 3, 2011, the court issued its order resolving the legal issue of the proper interpretation of the performance clause, finding the evidence supported Sephora's proffered construction that whether the hotel's performance was satisfactory and whether the performance impacted the success of the program were both subject to Sephora's sole judgment. However, the court went on to reject Sephora's nonsuit motion premised on *Carma*, explaining:

> "The testimony is undisputed . . . that some actual material impact to the conference had to occur and that pre-conference financial disputes would not qualify to invoke the termination right. The jury will determine, based upon the admitted evidence, whether the decision was made to terminate the contract before the 2009 conference, or whether [Sephora's] invocation of the performance clause was legitimately exercised.
>
> "The Court proposes the following language to instruct the jury:
>
> "The Court has ruled that the performance clause was subject to [Sephora's] sole satisfaction and that there is no 'objective' component. However, the election to terminate the 2010 conference must have been based upon the performance during the 2009

15

conference, and may not have been based on events which occurred before the conference. If you find that the decision to terminate the 2010 conference was made before the beginning of the 2009 conference, then [Sephora] was not authorized to invoke the performance clause, and would be in breach of the contract."

Although Sephora objected to the language of the proposed instruction, La Costa was satisfied with that language, stating "your instruction says it exactly right." The court ruled it would give this instruction over Sephora's objection. It then determined it would employ Sephora's special verdict form patterned on CACI No. VF-300. When La Costa objected that "there's no question [on the form] about whether [Sephora] breached the contract," Sephora noted that question 3 on the form (asking whether the defendant did something the contract prohibited it from doing) covered La Costa's concern, and the court agreed.

C. The Final Jury Instructions and Verdict Form

The court gave the CACI standard jury instructions for breach of contract and the elements governing the implied covenant of good faith and fair dealing, and gave special instructions on the performance clause, explaining:

> "The multi-year performance clause in the parties' contract granted [Sephora] the right to cancel the 2010 event . . . should [Sephora] in its sole opinion determine that [La Costa's] performance for the 2009 event was not satisfactory and[,] as a result, materially impacted the success of the event.

> "The Court has ruled that the multi-year performance clause was subject to [Sephora's] sole satisfaction and that there is no 'objective' component. However, the election to terminate the 2010 conference must have been based upon the performance during the 2009 conference, and may not have been based on events which occurred before the conference. If you find that the decision to terminate the 2010 conference was made before the beginning of the 2009

16

conference, [then Sephora] was not authorized to invoke the performance clause, and would be in breach of contract."

The court also gave special instructions (1) specifying that Sephora's subjective determination as to La Costa's performance must have been made in good faith, (2) defining good faith, and (3) explaining that good faith or its absence involves a factual inquiry into a person's subjective state of mind.

The relevant portion of the verdict form employed by the court, and the jury's responses, were as follows:

"1. Did plaintiff and defendant enter into a contract?

"[Answer:] Yes.

"If your answer to question 1 is 'Yes,' proceed to question 2. If you answered 'No,' stop here, answer no further questions, and have the presiding juror sign and date this form.

"2. Did all the conditions occur that were required for defendant's performance?

"[Answer:] Yes.

"If your answer to question 2 is 'Yes,' proceed to question 3. If you answered 'No,' stop here, answer no further questions, and have the presiding juror sign and date this form.

"3. Did the defendant do something that the contract prohibited it from doing?

"[Answer:] No.

"If your answer to question 3 is 'Yes,' proceed to question 4. If you answered 'No,' stop here, answer no further questions, and have the presiding juror sign and date this form. . . ."

17

In accordance with the special verdict, the court entered judgment in favor of Sephora, and La Costa timely appealed.[11]

## III

## ANALYSIS

### A. The Contract Interpretation Claim

One of the principal issues in dispute at trial was the proper interpretation of the performance clause. Sephora contended the parties intended the clause to give Sephora the right to cancel if it subjectively determined (1) La Costa's performance was unsatisfactory, *and* (2) the success of the SDC was materially impacted as a result. La Costa contended the parties intended the clause to give Sephora the right to cancel if two distinct conditions were satisfied: first, that Sephora subjectively determined La Costa's performance was unsatisfactory, and second, the success of the SDC was materially impacted as determined by an objective observer. The trial court ruled in favor of the former interpretation, and La Costa challenges that determination.

*Contract Interpretation and Standard of Review*

The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40, (*Pacific Gas & Electric*).) In engaging in this function, the trial court seeks to "give effect to the mutual intention of the parties as it existed" at the time the contract was executed. (Civ. Code,

---

11    The court subsequently awarded Sephora its costs and attorney fees, and La Costa also filed a notice of appeal from that order. However, La Costa has raised no claim of error as to the costs and attorney fees award.

18

§ 1636.)  Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.  (Civ. Code, § 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"]; Civ. Code, § 1638 [the "language of a contract is to govern its interpretation"].)

Although a court generally may not consider extrinsic evidence varying or contradicting the clear and unambiguous terms of a written, integrated contract (cf. *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1478), extrinsic evidence is admissible to interpret an agreement when a material term is ambiguous.  (*Pacific Gas & Electric, supra,* 69 Cal.2d at p. 37 [if extrinsic evidence reveals that apparently clear language in the contract is, in fact, susceptible to more than one reasonable interpretation, then extrinsic evidence may be used to determine the contracting parties' objective intent].)  When the meaning of the words used in a contract is disputed, the trial court engages in a three-step process. First, it provisionally receives any proffered extrinsic evidence relevant to prove a meaning to which the language of the instrument is reasonably susceptible.  (*Ibid*.)  If, considering the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract.  (*Id*. at pp. 39-40.)

On appeal, "[o]ur review of the trial court's interpretation of the agreement is governed by the settled rule that where extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable

19

construction of the agreement by the trial court which is supported by substantial evidence will be upheld." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) Accordingly, we defer to the trial court's construction if it was a reasonable construction of an ambiguous clause, and is supported by substantial evidence, when the trial court's ruling was based on conflicting evidence as to the intention of the contracting parties.

*Analysis*

The trial court examined a clause susceptible to more than one reasonable interpretation: the performance clause stated Sephora could cancel if "*in its sole opinion* [*Sephora*] *determines* that the Hotel's performance was not satisfactory and[,] as a result, materially impacted the success of the program," without explicitly stating whether the italicized language applied only to the determination of whether the hotel's performance was unsatisfactory (as contended by La Costa) or whether it also applied to the determination of whether "as a result, [the unsatisfactory performance] materially impacted the success of the program" (as contended by Sephora). The trial court, on conflicting evidence, interpreted the contract to intend that Sephora's "sole opinion determines" both determinations, and La Costa cites no authority suggesting an interpretation that falls squarely with the range of semantically permissible interpretations is an unreasonable interpretation to which an appellate court will not defer.

La Costa's claim on appeal instead appears to assert that we should accord no deference to the trial court's interpretation because it was not based on conflicting evidence, and therefore asserts we should review de novo the interpretation of the

20

contract. La Costa quotes a segment from the trial court's June 3, 2011, ruling, in which the trial court observed "the testimony is undisputed, however, that some actual material impact to the conference had to occur," to assert the trial court's ultimate construction of the contract--that Sephora had sole discretion to determine whether there had been a material impact on the success of the SDC--was fatally flawed and should be reviewed de novo because it was an interpretation based on undisputed facts.

We are not persuaded by La Costa's effort to skew the record, and thereby inject error into the ruling, because our review of the ruling as a whole convinces us the segment quoted by La Costa has been extracted from it proper context. In the June 3, 2011, ruling, the trial court ruled on *two distinct issues*: whether the contract was intended to give Sephora sole discretion over both satisfactory performance and material impact; and, if so, whether a grant of a sole discretionary determination was fatal under *Carma* to La Costa's claim for breach of the implied covenant of good faith and fair dealing. In ruling on the *former*, the court stated "the testimony regarding intent of the parties [as to the performance clause] *is inconsistent*" (italics added), but the court concluded the evidence supported the interpretation that "both the performance and material impact requirements were subject to [Sephora's] sole satisfaction." Far from finding the evidence was undisputed regarding the intended scope of Sephora's discretionary judgments, the court explicitly observed it was inconsistent.[12] The

---

[12]    This observation is supported by the record, because there *were* important evidentiary conflicts. By way of example only, statements made during the negotiations are probative of the parties' intent as to disputed language (cf. *Beneficial etc. Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 527), and there was directly conflicting evidence

21

segment quoted by La Costa, in which the trial court stated "the testimony is undisputed, however, that some actual material impact to the conference had to occur," was made in connection with the *second* issue--whether a grant of a sole discretionary determination was fatal to Sephora's claim for breach of the implied covenant of good faith and fair dealing.  The trial court concluded it was not fatal, because the ruling (read as a whole) was that "the testimony is undisputed, however, that some actual material impact to the conference had to occur *and that pre-conference financial disputes would not qualify to invoke the termination right*."  When placed in the context from which La Costa extracted the quote, the "undisputed" evidence referred to by the trial court was that the discretionary determination as to whether Sephora was satisfied with the hotel's performance had to be based on the hotel's handling of the 2009 SDC rather than La Costa's handling of Sephora's efforts to scale back the 2009 SDC.[13]

---

over whether Warzeniak and Green had discussed and understood that the "material impact" language was intended to apply *only* if the hotel ruined the SDC.  (See fn. 5, *ante*.)

[13]    Moreover, even assuming the segment quoted by La Costa could be extracted from its intended context (the ruling on Sephora's nonsuit motion) and then spliced into the other ruling (the contract interpretation ruling), we are still unconvinced the statement that "some actual material impact to the conference had to occur" would be irreconcilably inconsistent with the interpretation that Sephora's discretionary determinations encompassed the "actual material impact" element.  The fact the parties agreed that "some" actual material impact had to occur is distinct from the issue of whether the parties intended to vest in Sephora the discretion to decide whether the degree or magnitude of that "some" impact left Sephora sufficiently dissatisfied with the hotel's performance to enable it to cancel the next SDC.  There is evidence supporting the conclusion the parties understood Sephora had the discretion to decide whether the degree or magnitude of that "some" impact left it sufficiently dissatisfied with the hotel's performance to enable it to cancel: Sephora expressly communicated to La Costa that it wanted to be able to cancel if it was not "100% satisfied," and the trial court could infer

22

Because we conclude the trial court's construction of the language is a reasonable one and was based on conflicting evidence, we uphold that interpretation as long as it is supported by substantial evidence. (*In re Marriage of Fonstein, supra,* 17 Cal.3d at pp. 746-747.) La Costa does not appear to assert that, given the evidentiary conflicts, there was no substantial evidence to support the interpretation adopted by the trial court,[14] and we affirm the construction adopted by the trial court.

B. The Special Verdict Form Claim

La Costa asserts the special verdict form employed by the trial court "barred the jury from deliberating on" its claim for breach of the implied covenant of good faith and fair dealing, and this error requires reversal. Before examining La Costa's claim, we first outline the relevant legal principles.

*Implied Covenant Principles*

Every contract or agreement contains an implied promise of good faith and fair dealing, which means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. (*Carson v. Mercury Ins.*

---

La Costa was willing to accept that risk because it wanted to secure Sephora's commitment (because it filled empty rooms during the "shoulder season") and wanted to secure it quickly (because of the bonuses earned were the contract signed before March 31, 2008), and La Costa was unconcerned the clause would ever be triggered because of their confidence in the hotel's ability to provide satisfactory service.

14     Even assuming La Costa's briefing could be construed to have some embedded claim that there was not substantial evidence to support the judgment, we would deem it waived, because La Costa's briefing extracts only those snippets from the record supporting its interpretation and largely ignores the evidence supporting the construction adopted by the trial court. Under those circumstances, any challenge to the sufficiency of the evidence is waived. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

23

*Co.* (2012) 210 Cal.App.4th 409, 429). However, it is well established that the implied promise of good faith and fair dealing cannot create obligations inconsistent with the terms of the contract. (*Nein v. HostPro, Inc.* (2009) 174 Cal.App.4th 833, 852.) Although breach of a specific contractual provision is not a prerequisite to asserting this cause of action (*Carma, supra*, 2 Cal.4th at p. 373), "[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.] . . . [U]nder traditional contract principles, the implied covenant of good faith is read into contracts 'in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' " (*Ibid.*) " 'In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' " (*Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031-1032.) It exists "merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*. [Citation.] The covenant thus cannot ' "be endowed with an existence independent of its contractual underpinnings." ' [Citations.] It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349-350.)

Although breaches of distinct contractual obligations may properly be pleaded as separate counts, and a breach of the implied covenant is commonly pleaded as a separate

24

count, "a breach of the implied covenant is necessarily a breach of contract." (*Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 885.)

*Special Verdict Principles*

"In all cases the court may direct the jury to find a special verdict in writing, upon all, or any of the issues . . . ." (Code Civ. Proc., § 625.) "The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

A special verdict form is fatally defective if it does not allow the jury to resolve every controverted issue raised by the pleadings. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 (*Saxena*).) For example, in *Saxena,* the plaintiff pleaded claims for negligence and battery, which the court recognized were separate causes of action. The former cause of action was based on the claim the defendant doctor had not obtained the patient's "informed consent" to the procedure, "which sounds in negligence [and] arises when the doctor performs a procedure without first adequately disclosing the risks and alternatives. In contrast, a battery is an intentional tort that occurs when a doctor performs a procedure without obtaining any consent." (*Id*. at p. 324.) The special verdict form asked only whether the patient gave his "informed consent" to the procedure, to which the jury answered "no," but did not require the jury to answer "the separate and distinct question of whether [the doctor] performed the procedure with 'no consent' at all," an essential element of the battery claim. (*Id*. at p. 326.) *Saxena* concluded the

25

special verdict form employed there was fatally flawed because it did not address every controverted issue of fact raised by the pleadings. (*Id*. at p. 326.) Other courts have reached similar conclusions.[15]

*Analysis*

La Costa asserts the special verdict form, which largely tracked the approved special verdict form (CACI No. VF-300) for breach of contract cases, was fatally defective because it did not address La Costa's claim for breach of the implied covenant

---

[15] For example, in *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949 (*Myers*), the owner of a building and its general contractor filed cross-complaints against each other for breach of contract, fraud, and other claims. By special verdict, the jury concluded the building owner breached its contract with the general contractor, and awarded the general contractor punitive damages. (*Id*. at p. 956.) The Court of Appeal was required to strike the punitive damages award because "[n]o special verdict findings were submitted to the jury on any cause of action except breach of contract, even though [the general contractor] had pleaded a cause of action against [the building owner] for fraud" (*id*. at p. 958), and the punitive damages award could not be sustained because the jury "was neither requested to nor [made] the necessary factual findings" for a tort verdict. (*Id*. at p. 960.) In *Fuller-Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958 (*Fuller-Austin*), the court again found the special verdict fatally defective because it did not allow the jury to resolve every controverted issue. *Fuller-Austin* concerned the reasonableness of an insured's bankruptcy settlement and the effect of its reorganization plan on its excess insurers. After noting that excess insurers are entitled to defend against indemnity based on a claim the settlement was unreasonable, the appellate court reversed the jury's liability findings because the special verdict form was fatally defective in that it "did not require the jury to make any finding on the issue of [the] reasonableness" of the reorganization plan. (*Id*. at p. 1005.) The *Fuller-Austin* court concluded the question the jury was asked to answer--whether the reorganization plan was the product of unclean hands or collusion--could not save the verdict because "[t]he jury's finding that [the insured] was not guilty of inequitable misconduct did not answer the distinctly different question of whether the Plan was unreasonable." (*Id*. at p. 1006.)

26

of good faith and fair dealing.[16]  The verdict form *did* ask "Did [Sephora] do something that the contract prohibited it from doing?" but La Costa claims it was fatally defective because it did not specifically rephrase that question to be whether Sephora " 'unfairly interfered with [the plaintiff's] right to receive the benefits of the contract,' " and therefore La Costa claims the form did not submit a controverted issue raised by its claim for breach of the implied covenant.[17]

We conclude the record as a whole shows the special verdict form did not deprive La Costa of the right to have the jury resolve the controverted issues raised by its claim for breach of the implied covenant.  We are satisfied the jury understood this form

---

[16]    La Costa appears to argue use of CACI No. VF-300 was entirely improper because it is to be used "solely" for claims of breach of contract, and "does not [cover] a stand-alone claim for breach of the implied covenant . . . ."  La Costa cites nothing to support that claim, and it is contrary to the user comments that CACI No. VF-300 "is intended for use in most contract disputes."  Because the covenant of good faith and fair dealing is merely an additional clause implied in law "as a *supplement* to the express contractual covenants" (*Racine & Laramie, Ltd. v. Department of Parks & Recreation, supra,* 11 Cal.App.4th at p. 1031), and "a breach of the implied covenant is necessarily a breach of contract" (*Digerati Holdings, LLC v. Young Money Entertainment, LLC, supra,* 194 Cal.App.4th at p. 885), there appears no substantive impediment to using CACI No. VF-300 when the theory of a breach of contract claim rests on the implied-in-law covenant rather than the agreed-to express covenants.

[17]    La Costa did not proffer a special verdict form containing this language.  The closest formulation offered by La Costa asked four questions: "1. Before the start of the 2009 Store Directors Conference, did Sephora make the decision that it would not hold the 2010 Store Director Conference at La Costa?"; "2. Before the start of the 2009 Store Directors Conference, did Sephora breach the covenant of good faith and fair dealing . . . contained in the contract for the 2010 Store Director Conference?"; "3. Did Sephora honestly and in good faith believe that La Costa's performance during the 2009 Store Director Conference was not satisfactory?" and "4. Did Sephora honestly and in good faith believe that La Costa's performance during Sephora's 2009 Store Director Conference materially impacted the success of the program?"

27

required them to resolve the issues encompassed by the *only* claim submitted to the jury: the claim that Sephora breached its contract *by* violating the covenant of good faith and fair dealing.[18] The jury was instructed, using CACI approved instructions modified to fit the facts of this case, that:

> "[La Costa] and [Sephora] entered into contracts to hold [Sephora's] Store Director Conference at La Costa in 2009 and 2010. [¶] [La Costa] claims that [Sephora] *breached the contract by lacking a good faith belief* that [La Costa's] performance during the 2009 Store Director Conference was unsatisfactory and by canceling the 2010 Store Director Conference, even though nothing actually occurred which materially impacted the success of [Sephora's] program. [¶] . . . [¶] [Sephora] denies it breached the contact. [Sephora] also claims the cancellation was proper under the terms of the contract.
>
> "To recover damages from [Sephora] for breach of contract, [La Costa] must prove all of the following:
>
> "1. That [La Costa] and [Sephora] entered into a contract;
>
> "2. That [La Costa] did all, or substantially all, of the significant things that the contract required it to do;
>
> "3. That all conditions required by the contract for [Sephora's] performance had occurred;

---

18    This was the *only* claim submitted to the jury, because La Costa's first "cause of action" for breach of contract was rooted in the express terms of the performance clause and was premised on the claim that the performance clause only became operable if the hotel's performance " 'materially impacted the success of the program,' " and that because the hotel's alleged unsatisfactory performance "did not *objectively* 'materially [impact] the success of the 2009 Program,' [¶] . . . Sephora's invocation of the [performance clause] to terminate the August 2009 Contract constitutes a breach of contract." (Italics added.) The trial court's June 3, 2011, ruling, which construed the contract to intend that Sephora could invoke the performance clause if it *subjectively* judged the hotel's performance materially impacted the program's success, effectively terminated pursuit by La Costa of its first "cause of action" for breach of contract, and left only its second cause of action to be submitted to the jury.

"4. *That [Sephora] did something that the contract prohibited it from doing*; and,

"5. That [La Costa] was harmed . . . ."  (Italics added.)

The court then gave a series of special instructions, including "Additional Instruction No. 1" and "Additional Instruction No. 8," which together instructed the jury that:

"The multi-year performance clause in the parties' contract granted [Sephora] the right to cancel the 2010 event at La Costa should [Sephora] in its sole opinion determine that [La Costa's] performance for the 2009 event was not satisfactory and[,] as result, materially impacted the success of the event. [¶] The Court has ruled that the multi-year performance clause was subject to [Sephora's] sole satisfaction and that there is no 'objective' component. However, the election to terminate the 2010 conference *must have been based upon the performance during the 2009 conference*, and may not have been based on events which occurred before the conference. *If you find that the decision to terminate the 2010 conference was made before the beginning of the 2009 conference, [then Sephora] was not authorized to invoke the performance clause, and would be in breach of the contract.*"

The court, expanding on the relevant considerations, also gave special instructions (1) specifying that Sephora's power under the multi-year performance clause to make a purely subjective decision as to La Costa's performance and any material impact must have been a decision made in good faith, (2) defining good faith using the language proposed by La Costa, and (3) explaining that good faith or its absence involved a factual inquiry into a person's subjective state of mind, including whether the actor believed the decision was valid and what was the intent or purpose in making that decision.[19]

---

[19]     The court also gave CACI No. 325, the standard CACI instruction on the elements of a claim for breach of the implied covenant, including that La Costa was required to

29

We presume the jury understood and followed the instructions given by the court (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803), and understood how to apply those instructions to the questions posed by the special verdict form, particularly when the court had expressly directed the jury that "if you find that the decision to terminate the 2010 conference was made before the beginning of the 2009 conference, then [Sephora] was not authorized to invoke the performance clause, and *would be in breach of contract*." Moreover, even assuming there was some hint of ambiguity whether question 3, asking if the jury found Sephora "did something that the contract prohibited it from doing," was the pivotal question around which La Costa's claims of breach of the implied covenant turned, that ambiguity was dispelled by La Costa's closing argument. During closing argument, La Costa's attorney extensively argued that the evidence showed Sephora's decision to cancel the 2010 SDC was *not* based on the hotel's performance during the 2009 SDC or any alleged impacts on the success of the 2009 program. La Costa's attorney noted, if the jury concluded the decision was made before the 2009 program occurred, the judge's instructions required the jury to find in favor of La Costa, and argued the evidence showed the decision was made before the 2009 program occurred. He also noted, although Sephora could cancel the 2010 SDC if it believed the hotel's performance during the 2009 SDC was not satisfactory and impacted the success of the 2009 program, that decision had to be reached in good faith and not to evade the spirit of the bargain reflected in the contract, and argued that even if the jury did not find Sephora decided to cancel before the 2009 SDC, La Costa was still entitled

show Sephora "unfairly interfered with [La Costa's] right to receive the benefits of the contract."

30

to prevail because the evidence showed Sephora's decision to cancel had been made in bad faith for reasons unconnected to the hotel's performance. La Costa's counsel then concluded his argument by saying, "*Let's talk about some of the forms you have to complete*" (referring to the special verdict form) and, after noting there was "no dispute" about the first three items, explained La Costa also was required "to prove that Sephora did something that the contract prohibited them from doing, and we have done that over and over again." Moreover, if there is any doubt about how the verdict form operated, La Costa's counsel in rebuttal argued that if the jury agreed Sephora either decided to cancel before the 2009 meeting or acted in bad faith when it later decided to cancel, it was required to award La Costa damages in line number six of the verdict form, noting:

> "[Y]ou have got to answer the questions that get you to line six in a way that get[s] you there. Did the parties enter into a contract? Yes. Did all [of the] conditions occur that were required for [Sephora's] performance? What does that mean? Were we willing to host 2010? Were we ready to host 2010? Those were the conditions that were required, and we met those conditions.
>
> "Number three, did [Sephora] do something that the contract prohibited it from doing? That's what the whole case is about the judge is instructing you. That good faith governs all of their actions. When they . . . decided to cancel 2010 before 2009 occurred, they did something the contract prohibited them from doing. . . ."

In *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, this court reached a similar conclusion under analogous circumstances. In *Red Mountain*, the trial court tendered to a jury by special verdict the issue of whether there were any damages to a property owner from the utility district's (Fallbrook) actions, and Fallbrook contended the trial court prejudicially erred by refusing to include inquiries to the jury about Fallbrook's contract defense of impossibility or impracticability of

31

performance in the special verdict. This court concluded the trial court's refusal to include specific questions about impossibility or impracticability of performance in the verdict form was neither an abuse of discretion nor prejudicial error, because "the jury was instructed to find that Fallbrook's performance of the contract was excused and the contract discharged if Fallbrook met its burden of proving that its performance became 'impossible except at impractical, excessive, unreasonable expense or risk of injury not contemplated by the parties at the time the contract was made.' We presume that the jury followed the instructions it was given [citation] and that it would not have found that Fallbrook breached its agreement to grant the access easement if it had found that Fallbrook's performance was impossible or impracticable." (*Id*. at pp. 364-365, fn. omitted.)

Moreover, this court also noted that "[w]hen Fallbrook's counsel asked the trial court to include the defense of impossibility or impracticability in the verdict form, the court noted that the defense was covered by a jury instruction and advised counsel that it was his job to argue the defense as a basis for answering 'no' to the special verdict question of whether Fallbrook had breached the contract to grant the access easement. During closing argument, Fallbrook's counsel quoted the above noted instruction regarding impossible or impractical performance and argued that the jury should find that Fallbrook had not breached the contract . . . ." (*Red Mountain, LLC v. Fallbrook Public Utility Dist., supra,* 143 Cal.App.4th at p. 365, fn. 21.) Similar facts exist here: the claim La Costa argues was omitted was fully covered by the court's instructions, and La Costa's counsel both fully argued that claim and explained in detail how the jury should signify

32

its acceptance of La Costa's claim within the confines of the special verdict form before it.

The cases relied on by La Costa are inapposite to the analysis of whether the verdict form here was fatally defective. La Costa cites numerous cases for the proposition that a set of jury instructions themselves complete and correct cannot save a defective special verdict form. (See, e.g., *Myers, supra,* 13 Cal.App.4th at p. 960; *Fuller-Austin,* 135 Cal.App.4th at p. 1005.) However, those cases are inapposite.

For example, in *Myers*, the builder asserted claims in contract and in tort (for fraud and breach of fiduciary duty); the special verdict form contained questions pertaining only to the contract claim but provided no place for the jury to find in favor of the builder on his tort claims. (*Myers, supra,* 13 Cal.App.4th at pp. 956-958.) The jury found in favor of the builder on the contract claim but also awarded punitive damages, and the Court of Appeal was required to strike the punitive damages award because "[n]o special verdict findings were submitted to the jury on any cause of action except breach of contract" (*id*. at p. 958), and the punitive damages award could not be sustained because the jury "was neither requested to nor [made] the necessary factual findings" for a tort verdict. (*Id*. at p. 960.) The *Myers* court, rejecting the argument that the punitive damage award was sustainable because the jury was properly instructed concerning the elements of a fraud claim, and there was substantial evidence to support a finding of fraud, explained that "a finding of fraud, however, was never expressly or impliedly made by the jury in its special verdict which found only that [owner] had breached its contract with [builder]. A jury instruction alone does not constitute a finding. Nor does the fact

33

that the evidence might support such a finding constitute a finding. . . . [W]ithout an actual verdict by the jury on a fraud (or other tort) cause of action, the instructions and evidence cannot support the punitive damage award." (*Id.* at p. 961, fns. omitted.) In contrast to *Myers*, La Costa's case was submitted to the jury on a *single* claim--breach of contract based on violation of the implied covenant of good faith and fair dealing--and the jury was asked to find whether Sephora was liable because it done "something the contract prohibited them from doing," and the instructions focused the jury's attention on the single cause of action.[20]

Here, the jury was asked to decide whether Sephora "did something that the contract prohibited it from doing." Because the court ruled, and instructed the jury, that Sephora was *not* prohibited from canceling the contract if cancellation was based on Sephora's good faith opinion that La Costa's performance at the 2009 event was

---

[20]   Similarly, in *Fuller-Austin, supra*, 135 Cal.App.4th 958, the court found the special verdict fatally defective because it did not allow the jury to resolve every controverted issue, because the excess insurer defended against indemnification by interposing two distinct defenses: (1) was the settlement by the insured "reasonable" and (2) did equitable considerations of unclean hands and collusion excuse indemnification. The appellate court reversed the jury's liability findings because the special verdict form was fatally defective in that it "did not require the jury to make any finding on the issue of [the] reasonableness" of the reorganization plan; instead, the only question posed to the jury was whether the reorganization plan was the product of unclean hands or collusion. The *Fuller-Austin* court reasoned that, even assuming the jury was fully instructed on both concepts, the jury's answer to the latter query could not save the verdict because "[t]he jury's finding that [the insured] was not guilty of inequitable misconduct did not answer the distinctly different question of whether the Plan was unreasonable." (*Id*. at p. 1006.) In contrast, La Costa submitted a single breach of contract claim, based on the theory of breach of the implied covenant of good faith and fair dealing, and the jury was asked to find whether Sephora was liable because it done "something the contract prohibited them from doing," and the instructions focused the jury's attention on the single claim with instructions guiding resolution of the breach of the implied covenant of good faith and fair dealing.

34

unsatisfactory and materially impacted the success of the event, the only issue submitted to the jury was whether Sephora did something the contract prohibited it from doing, e.g. canceling for reasons *other* than its good faith opinion that La Costa's performance at the 2009 event was unsatisfactory and materially impacted the success of the event. We conclude the special verdict form adequately required the jury to resolve the controverted issues raised by La Costa's claim for breach of the implied covenant.

## DISPOSITION

The judgment is affirmed. Sephora is entitled to costs on appeal.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.